**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROMEO HOLLOWAY | No. 20-CR-00381<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION & ORDER**

A Chicago Police Department officer and two Bureau of Alcohol, Tobacco, Firearms, and Explosives agents stopped and frisked Romeo Holloway ("Holloway"), recovering a handgun. At the police station Holloway gave a *Mirandized* statement and consented to a search of his cell phone. He is charged with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Holloway argues the officers violated his Fourth Amendment right to be free from unreasonable searches and seizures. (Dkt. 23). The Court held a suppression hearing on May 25, 2021. The parties filed supplemental briefing on October 29, 2021. (Dkts. 54, 55). Holloway's motion to suppress is granted for the following reasons.

**LEGAL STANDARD**

The Fourth Amendment allows for a "limited intrusion into an individual's privacy" if police officers have "reasonable suspicion to believe criminal activity is afoot." *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) (*citing Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Officers must be able to "point to specific and articulable

facts" when justifying intruding on an individual's privacy by stopping them in public. *Terry*, 392 U.S. at 21. Reasonable suspicion is "more than a hunch" but less than probable cause, and significantly less than a preponderance of the evidence. *See Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000). When justifying a frisk, an officer must also point to "articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) (*citing Terry*, 392 U.S. at 27). These are two distinct standards, requiring separate consideration. *Id. See Williams*, 731 F.3d at 682–83 ("if we determine that the initial stop [. . .] was unconstitutional, then we must also determine that all of the later occurrences, including the frisk and recovery of the firearm, were similarly unconstitutional, and likely warrant suppression.").

## ANALYSIS

**A. The Stop**

On July 21, 2020, Special Agents Chris Labno (Labno) and Rick Rayner (Rayner) of the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) met Officer Joseph Cappello (Cappello) at the Chicago Police Department's 11th precinct station. It was the first day of Operation Legend, a national initiative through which federal agents were deployed by the United States Department of Justice to partner with local police departments and target violent crime in cities. (Tr. 26:4–17, 65:19–23, 114:23–25).[1] Agents Labno and Rayner asked Officer

---

[1] The facts are taken from testimony and other evidence admitted during the suppression hearing held on May 25, 2021. The transcript of this hearing (Dkt. 52) is cited as Tr. followed by the page and line number.

Cappello to "show them around the 11th District." (Tr. 26:16–17). At around 7:00 PM they set out in an unmarked ATF vehicle, Agent Labno driving, Officer Cappello in the front passenger seat, and Agent Rayner in the rear right-hand passenger seat. Cappello directed the ATF agents to the intersection of California Avenue and Flournoy Street, describing it as "a stronghold for the Cali Boy faction." (Tr. 27:22). He directed the agents to this area first because it was "closest to the district [police station]" and because it was an area with "lot[s] of shootings, lots[s] of homicides, big in narcotics sales, [and] lot[s] of criminal activity." (Tr. 28:16–21).

Agent Labno turned onto Flournoy Street, driving eastbound. There were cars parked on the north side of Flournoy, and the officers were traveling at a speed of about 15 miles per hour. (Tr. 29:20–21, 44:15–17, 73:11–14). As the officers approached, Officer Cappello saw Holloway standing on the north side of the street, walking toward a parked car. (Tr. 30:1–4). Officer Cappello told both ATF agents Holloway "was on parole and that he's a high-ranking member within the Cali Boys." (Tr. 31:3–4). Agents Labno and Rayner both testified that Officer Cappello pointed out Holloway as a member of the Cali Boys who was on parole.[2] (Tr. 72:7–11, 104-05:25-1).

---

[2] The Court is confident that Officer Cappello was familiar with the Cali Boys faction of the Traveling Vice Lords, as "a very predominant gang within the 11th District" where Officer Cappello had worked for seven years. (Tr. 20:10-22). The Court also believes Officer Cappello knew Holloway in particular because, as a ranking member of the Cali Boys, Holloway had been discussed "in several briefings," (Tr. 22:18–23, 23:4–6), and his photograph was displayed on bulletin boards at the 11th precinct police station. (Tr. 24-25). Therefore, *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018), finding that because it is legal to carry a handgun, "a mere possibility of unlawful use" is insufficient to establish reasonable suspicion, is not persuasive here.

Officer Cappello then saw Holloway "fidget" and "make movements towards his front waistband area." (Tr. 31:7–9). According to Officer Cappello, this fidgeting, combined with Holloway's "background history" made him suspect that Holloway was attempting to conceal a firearm. (Tr. 31:18–20). When asked to explain Cappello testified:

> Based on my police experience and just having several hundred -- ... gun arrests and being a part of them, just observing subjects' tendencies on the street is that I believe that Romeo Holloway was attempting to conceal some type of firearm in his front waistband area. (Tr. 31:11–15).[3]

Officer Cappello exited the vehicle to approach Holloway, and Holloway became visibly nervous, "eyes bulging". (Tr. 32:5-8). For a second time Cappello saw Holloway "manipulating his front waistband area frantically."[4] (Tr. 33:19-20). Officer Cappello drew his weapon. (Tr. 33:22).

According to Agent Labno, when Officer Cappello identified Holloway, Labno saw Holloway "pulling up his pants" and "blousing his shirt over his pants". (Tr. 73:7–10). Labno believed Holloway was concealing a weapon. *Id.* Agent Labno told Officer Cappello that he thought Holloway was concealing a gun, and Officer Cappello agreed. (Tr. 74:8–16). Agent Labno stopped the vehicle, "stood on [the vehicle's] running board [and] unholstered [his] firearm." (Tr. 76:13–14).

---

[3] There is no bodycam evidence up to this point because Officer Cappello's chest height camera was recording inside the vehicle. (Tr. 37:3-5).

[4] Officer Cappello's approach is reflected in the body cam at marker 1:41 seconds. The footage does not support Cappello's memory that Holloway engaged in any frantic movements. (Tr. 33:17-22).

The parties agree that when the officers drew their weapons, Holloway was seized. (Tr. 117:20–118:15). The Court must determine whether, at that time, the officers had reasonable suspicion to subject Holloway to a stop. Reasonable suspicion turns on "the totality of the circumstances," *Richmond*, 924 F.3d at 411, and whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). The government bears the burden of establishing reasonable suspicion, *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

The government, acknowledging that presence in a high crime neighborhood is not enough to establish reasonable suspicion, asserts that this fact combined with Holloway's "evasive behavior (moving his hand at his waist and mak[ing] a downward motion, consistent with concealing a firearm)" combined with the officers' experience amounted to reasonable suspicion. (Dkt. 54 at 12-13). The government largely relies on the Seventh Circuit's cases where an officer observes a bulge in a defendant's clothing. *Id.* at 9 citing *United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020) (reasonable suspicion based on "conspicuous bulge" in suspect's pocket, in high-crime area, and suspect's evasive behavior); *Richmond*, 924 F.3d at 411-14 (reasonable suspicion based on evasive behavior in a high-crime area at night and a gun-like bulge in pocket); *United States v. Adair,* 925 F.3d 931, 934 (7th Cir. 2019) (reasonable suspicion where there was a "conspicuous, large bulge in the front pocket of

5

[defendant's] jeans"). The problem with the government's argument is that neither Officer Cappello nor Agent Labno saw a bulge prior to the stop.[5]

Holloway responds that in cases where the officer did not see a bulge, a fidget or a furtive movement at the waist is more akin to the Seventh Circuit's jurisprudence on hands in pockets. (Dkt. 55 at 6-7). The Court agrees. In *Williams*, 731 F.3d at 686–87, when responding to a nighttime 911 call in a high crime area, Williams "had his hands in his pocket or near his waistband, avoided eye contact, and began to move away from" the group being questioned by the police. The *Williams* court reasoned that "the simple fact that one's hands are in one's pockets is of a similar nature to one's avoiding eye contact. In other words, it is of little value." *Id.* at 689. *See also United States v. Howell*, 958 F.3d 589, 600 (7th Cir. 2020) (reasonable to stop defendant where police are responding to 911 call, defendant resembled suspect, looked panicked and refused to respond to police; but no reasonable suspicion to frisk where 911 was from anonymous source, no indication person armed, no reasonable suspicion where all officer saw was defendant "appear nervous and panicked, fall silent, and put his hands in his pockets"—the court noted that "nobody claims he had a bulge in his pocket or made any move to hide anything.").

While any conduct must be considered in the totality of the circumstances, the Court finds that fidgeting with one's waistband or pulling up one's pants is more akin to having one's hands in pockets (meaning it is innocent behavior) than being seen

---

[5] The government asserts Labno saw a "bulge consistent with a firearm". (Dkt. 54 at 11). As discussed below, Labno's testimony on this point was grossly exaggerated and is not corroborated by the body cam footage. It is not credited by the Court. Moreover, Labno testified that he saw the bulge *after* he pulled his weapon, so it could not support the stop in any event. (Tr. 78:5-15).

with a bulge. Holloway relies on an out of district case that analyzed the scenario where a defendant grabbed his waistband (as opposed to placing hands in pockets) and based on the totality of the circumstances, found such conduct did not amount to reasonable suspicion. *United States v. Davis*, No. CRIM. H-08-028, 2008 WL 4372705, at *4 (S.D. Tex. Sept. 22, 2008), surveyed the cases involving high-crime areas where the defendant "grabbed or held his waistband in a manner consistent with possession of a concealed firearm[.]" *Davis* concluded that "the cases that approved a *Terry* stop all involved additional factors-such as unprovoked flight, evasion, an informant's tip, or other activity consistent with crime" to support reasonable suspicion.[6] *Id.* at *3. Davis himself was holding his pants by his waist, and when he saw the officers his "face changed to a nervous or 'panicked' expression, and his hand holding the clothing near his waist 'clutched' a bit more tightly." *Id.* at *1. The Court granted the motion to suppress because otherwise it would be allowing "a stop and frisk whenever an officer in a high-crime area encounters an individual with a criminal history who wears baggy clothing [and] … appears nervous in reaction to seeing the police but does not try to evade or flee." *Id.* at *5.

---

[6] The *Davis* court noted cases where defendant reached for his waist required some incriminating activity to support reasonable suspicion. *See United States v. Hart,* 2006 WL 851172 at *2 (E.D.La. Mar.14, 2006) (defendant saw police, immediately placed hands on waistband, then turned and headed toward front door of house); and *United States v. Sutton,* 2001 WL 238221 (E.D.La. Mar.9, 2001) (defendant saw police, grabbed waistband, turned and ran away from officers). In other cases where defendant grabbed his waistband, the officers had other reasons to suspect that the defendant was engaged in criminal activity. *See United States v. Gooden,* 2000 WL 1092856 *1 (E.D.La. Mar.2, 2000) (police responding to tip robbery taking place by suspect with a gun and defendant, who matched the description, grabbed for his waist); *United States v. Samuels,* 131 Fed. Appx. 859, 862-63 (3d Cir.2005) (bulge visible when officers responded to tip and defendant moved hand toward waist after being ordered to put hands up).

The government argues that Officer Cappello relied on his experience. Officer Cappello testified he made the decision to stop Holloway because "[b]ased on my experience, just I believe that he was, in fact, in possession of that firearm." (Tr. 33:24-25). With respect, Officer Cappello had a hunch. *Compare, United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (finding reasonable suspicion where officers questioning group and defendant "separated himself from the group by taking a few steps backward [and] angled his body away from [police] so that they were unable to view [his] right side" and defendant kept lowering his hand to his pants pocket after being ordered to raise hands and officers testified they relied on their experience and training because they were "trained to watch for such behavior" as a person who "pats his waistband may be trying to confirm that his gun is concealed and secured.").

The Court concludes that the officers did not have reasonable suspicion— meaning "specific and articulable facts" that crime is afoot—to justify stopping Romeo Holloway on July 21, 2020. Officer Capello, relying on Holloway's criminal record, his fidgeting with this waistband, in his high crime neighborhood, had a hunch that he was carrying a firearm. The Fourth Amendment requires more. *See e.g., United States v. Walden*, 146 F.3d 487, 490–91 (7th Cir. 1998) (emphasis added) (cautioning that "[r]easonable suspicion of criminal activity cannot be based solely on a person's prior criminal record" and finding that Walden's criminal record combined with a traffic violation, and an "officer safety alert" that the Defendant was *armed and dangerous* justified the stop and frisk to support reasonable suspicion finding); *Matz v. Klotka*,

8

769 F.3d 517, 523 (7th Cir. 2014) (emphasis added) (officers' identification of Defendant as a member of the Latin Kings gang, was *combined with* their knowledge of his open warrant, and Defendant's flight as officers approached, justified the stop).

**B. The Frisk**

As Officer Cappello rounded the back of the officers' vehicle and approached Holloway he testified he saw Holloway "manipulating his front waistband area frantically" and making "a downward motion." (Tr. 33:19–22). This testimony is not supported by Officer Cappello's body camera footage. The footage shows Holloway moving his hand in the vicinity of his waistband but no frantic motion. (Dkt. 28 at 3). Additionally, according to Cappello, Holloway became visibly nervous.[7] Officer Capello also testified that Holloway "bec[ame] very confused [and] almost attempted to run away from the vehicle." (Tr. 48:16–17). The Court finds that this is contradicted by the body camera footage. At no time did Holloway make any movement that could be interpreted as an attempt to flee. Cappello immediately detained Holloway and "performed a protective pat-down [search]." (Tr. 34:18-19).

Agent Labno was standing on the running board of the driver's side ordering Holloway to show his hands. From this elevated vantage point he testified that he saw Holloway "pushing something down and throwing something. It was very—it was a very weird motion that he made. It was a two-handed at the same time, where he

---

[7] Nervousness is a natural response when law enforcement approaches and, while it is one factor that to consider when analyzing reasonable suspicion, "[n]ervousness alone, at least as a categorical matter, does not create reasonable suspicion that a suspect is armed and dangerous." *Howell*, 958 F.3d at 593 (citing *Williams*, 731 F.3d at 687 (recognizing that '[m]ost people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area')."

9

pushed it through. And it was, quite honestly, confusing to me at first because I—I saw it and I—it was almost like he was making a giant motion and doing two things at once." (Tr. 96:23–97:4). Agent Labno elaborated that "there appeared to be a bulge in his clothing which I thought was consistent with the butt of a handgun that he was pushing down." (Tr. 97:7–9). The Court finds this testimony exaggerated. None of it is corroborated by the bodycam evidence. The parties displayed portions of the video--slowed it to frame by frame--and Holloway is never seen pushing "two handed" or making what would be considered a "very weird motion". In addition, Officer Cappello would not be privy to Labno's observations when he decided to frisk Holloway. The Court does not consider Labno's testimony in determining reasonable suspicion to frisk.

The government must establish Officer Cappello had "articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *Williams*, 731 F.3d at 686 (*citing Terry*, 392 U.S. at 27). Because the Court does not find it credible that Holloway either tried to flee or "frantically" manipulated his waistband, the Court determines whether Officer Cappello had reasonable suspicion to frisk based on Holloway's felony record, known membership in a gang, furtive movements at his waist in his high crime neighborhood. The government stresses that the officers were "specifically patrolling areas on the west side that evening as part of a nationwide effort to combat violent crime in Chicago" and the block (2700 West Flournoy) "was Cali Boy territory, [and]

10

the Cali Boys were involved in shootings and carjackings, and … that specific block was the site of violent crime and narcotics transactions." (Dkt. 54 at 10).

The violence plaguing Chicago is of great concern to the Court. And Officer Cappello's knowledge of the area and Holloway's felony and gang membership are part of the totality of the circumstances. But Fourth Amendment standards are not lower on 2700 West Flournoy. The officers were not responding to a 911 call or a shotspotter. They turned onto Flournoy and observed Holloway walking to a parked car, not engaging in any criminal activity (drinking on the public way, passing a baggie in a window, etc). He was not subject to an active warrant. He did not flee when he saw the unmarked police vehicle. The only conduct Holloway engaged in was touching has waistband—Officer Cappello, based on his experience and knowing Holloway, had a hunch Holloway was carrying a weapon. He appeared nervous to Officer Cappello. But he complied when told to raise his hands. The Court has exhaustively reviewed the case authority, the parties' submissions, the officers' testimony and the exhibits and does not believe the government has met its burden to establish Officer Cappello, who was correct in his hunch, had a reasonable suspicion to stop or frisk Holloway on July 21, 2020.

## C. Fruit of the Poisonous Tree

The Government does not contest Holloway's assertion that, if the stop and frisk were unconstitutional, his subsequent statement, following *Miranda* warnings, about possessing a gun and the photographs found in his phone following his consent are fruits of the poisonous tree. (Dkt. 23, 14–15). The government has therefore

11

waived any objection to this argument. *See United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015). Holloway relies on *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999) (suppressing statement and evidence from a subsequent search that were obtained as a consequence of an unlawful *Terry* stop); *United States v. Williams,* 702 F. Supp. 2d 1021, 1026 (N.D. Ill. 2010) ("even if a consent to search is voluntary, it is still invalid unless the taint of the preceding illegality is sufficiently purged"). *See also United States v. Jerez,* 108 F.3d 684, 695 (7th Cir. 1997) ("we follow the strong body of case law in our circuit, as well as in other circuits, that has held ... that the voluntary consents [to search] were tainted by illegal stops, detentions or arrests."); *United States v. Palomino-Chavez*, 761 F. App'x 637, 644 (7th Cir. 2019) (reversing denial of motion to suppress where stop and frisk was illegal and that illegality tainted defendant's consent). The Court adopts the reasoning of these cases and suppresses the statement and search of the phone.

## CONCLUSION

For the reasons detailed above, the motion to suppress [23] is granted. This Order is stayed for thirty (30) days. The court strikes the status set for 12/21/21 and resets it to January 13, 2022 at 10:15 AM. Defendant will be present telephonically. Defendant shall remain in custody pending the stay. The time between today's date and January 13, 2022 is excluded pursuant to 18 U.S.C. §§ 3161 (h)(1)(D), (H) and (h)(7)(A).

E N T E R:

Dated: December 13, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

13